(13 Misc. Rep. 657.)

## HUDA v. AMERICAN GLUCOSE CO.

(Superior Court of Buffalo, General Term. July 30, 1895.)

1. MASTER AND SERVANT—MEANS OF ESCAPE FROM FIRE.
   While plaintiff's intestate was at work on the seventh floor of defendant's eight-story factory, the building caught fire on the ground floor, and intestate was burned. Intestate came with a fellow workman from the seventh to the fourth floor, where the smoke was so dense that they could proceed no further. Intestate was last seen on the fourth floor. The fellow workman reached a window, and descended the fire escape. It appeared that the building was furnished with three fire escapes, which could be reached from the roof, or from the windows on either of two sides of the building, and that there were three staircases leading from the ground floor to the roof. Defendant's business required the windows of the upper floors to be kept shut, and for that reason they were nailed down, but they were not strong, and could easily be knocked out. A number of workmen escaped by such windows, and all of them broke the windows out, and none who reached a window failed to escape. *Held,* that defendant was not negligent, in failing to provide a sufficient means for his servants to escape in case of fire.

2. SAME—RULES—FASTENING WINDOWS.
   A rule which requires the windows of a factory to be kept shut, in order to maintain a certain temperature, cannot be construed to forbid workmen to open the windows in order to escape in case of fire.

3. SAME—RISKS ASSUMED.
   A servant who continues to work in a building in which the character of the work requires the windows to be kept shut, knowing that the windows are nailed down to insure their being kept shut, assumes the risks incident to such state of affairs in case of fire.

Appeal from trial term.

Action by Mary Anna Huda, as administratrix, etc., against the American Glucose Company. From an order setting aside the verdict in favor of plaintiff, and granting a new trial, plaintiff appeals. Affirmed.

The action arises out of the burning of defendant's factory building, by which plaintiff's intestate lost his life. The facts which may be considered as established by the verdict, and those conceded, are these: The factory was of brick, about 180 feet square and eight stories in height, wherein was carried on the conversion of corn into glucose. The north side of the building abutted on the Hamburg canal. The south side fronted on Scott street. This was called the "Starch Building." On the south side of Scott street, and directly opposite the "Starch Building," was the "Feed Building," so called, which was five stories in height. The buildings were connected by a bridge fourteen feet wide and two stories in height, connected with the starch building between the fifth and sixth stories. This bridge was reached from the latter building by six or eight steps going up from the fifth story, and down from the sixth story. There were three separate sets of stairs running from the ground floor of the starch building to the eighth story; and from the eighth story to the roof, two separate sets. The building was equipped with three fire escapes, consisting of iron ladders running from the roof to the ground, two of which were on the Scott street side; the third, on the north side, directly over the canal. Balconies on each side of the ladder were constructed at each story, extended sufficiently far to include two windows. These windows were about 16 inches above the floor, were sufficiently large to allow easy passage to the balconies, and in the fourth, fifth, and sixth stories the frame of the windows was of light pine wood, ordinarily termed a "box frame." The sash was in two parts, with center mullion, and four panes of glass, 16 inches square, in each sash. The whole was of cheap construction, and not very strong. No weights held them up, and, when raised, they were required to be propped. There were about 26 on each side of each floor. The upper floors of the building were used for depositing starch, which first came to the tables in a liquid form, from which the starch was precipitated. A uniform temperature of from 80 to 85 degrees in the room was essential to the process. It may be assumed that in all the stories above the fourth all of the windows were fastened down, so that they could not be raised, and defendant had caused to be posted notices about the building prohibiting the raising of the windows, and attaching the penalty of immediate discharge for its violation. The object of this was to maintain the uniform temperature required in the rooms. Plaintiff's intestate had been employed as a starch shoveler in this building some 12 years, and was familiar with all the surroundings. The usual way in which the bulk of the men employed in the upper part of the building reached their respective floors was by entering the feed building, where they received their time checks, passing up the stairs to the bridge, thence across to the main building. They returned the same way, giving in their checks at the feed building. The building was lit by electricity, which was generated on the ground floor. On April 12, 1894, at about 7 o'clock in the evening, fire was discovered in the dynamo room. It quickly communicated with the other parts of the main structure, cut off the electric light, generated dense volumes of thick smoke, and acid fumes from the materials used in the manufacture, which rapidly filled all parts of the building. The fire destroyed the main building first; was communicated to the feed building, and destroyed it. When the fire broke out, there were about 22 men in the upper stories, about one-half of whom failed to escape. It is probable that plaintiff's intestate was on the seventh floor when the fire broke out, as that was the floor where he went to work when he entered the building. He was first seen, however, on the sixth floor, and, so far as his subsequent movements are known, the witness Lewandowski details them in these words: "On the night of the fire I was at work on the seventh floor. I saw smoke coming up. It was growing dark. The lights went out about three minutes before I saw the smoke. One other man was

working on the floor with me. Valentine Huda went down the steps with me. We were going down from the fifth to the fourth floor. Huda reached the fourth floor. I do not know what became of him, from that point. I saw him after he got on the fourth floor. He was standing on the fourth floor about a minute. Q. What was he saying,—anything? A. Yes sir; he spoke. There was very much smoke on the fourth floor at the time. I lost sight of Huda within a minute after my reaching the fourth floor. I could not see him, because of the smoke that surrounded us. We were together, so we could get hold of one another. We were in reach of one another. This was while we were on the floor, not on the steps. I threw myself on the floor, face down, towards the window, because the smoke was choking me. I was then about three feet from the window. Three of us were there, and we broke the window out. One of the men with me was foreman, and the other man's name was Mike. I got out of the window by sliding down the foreman's leg to the third floor. * * * Q. At the time you left Huda on the fourth floor, you say the smoke was so thick you had to throw yourself on the floor to get out? A. It was not so thick and heavy as that yet. Q. How long did you stay there before you threw yourself on the floor? A. About a minute. Q. What were you waiting a minute for? A. I could not run away anywhere. Q. Why not? A. The shop was full of smoke. Q. This floor you speak of? A. Yes, sir." On cross-examination the witness stated: "I first saw Huda on the fifth floor, and then we went down together from the fifth to the fourth floor. Q. Was Huda ahead of you? A. He went down the same time. I was stopped from going any further by the smoke. When the foreman broke the window open, I was on the fourth floor. We broke a pane of glass the same time I threw myself down. They broke it, and then I threw myself down. I helped break the window open, and after that I threw myself down on my face. After that I crawled along, and got hold of the foreman's leg, out of the window." Some of the men broke out the windows at the fire escapes, and passed down in safety, and one or more found an exit over the bridge. It does not appear that any went to the roof, but all who reached the fire escapes or the bridge had little or no difficulty in making safe exit from the building.

Argued before TITUS, C. J., and HATCH, J.

Parker & Alexander, for appellant.
Louis L. Babcock, for respondent.

HATCH, J.   The record is singularly free of conflicting testimony, and the questions presented may be disposed of on undisputed facts.   The origin of the fire is not known, and while the complaint alleged negligence on defendant's part, in its origin, such claim was abandoned upon the trial, and is not now urged.   It is also conceded that the fire escapes were sufficient, and that no liability can be predicated upon failure of compliance with any statutory duty in that regard.   The court below, in its submission of the case, authorized the jury to say whether or not the fastening down of the windows made egress by them difficult, and, if so, did this impediment prevent deceased from leaving the building, whereby he lost his life?   Claim is now made, and pertinaciously argued, that this proposition presented a question of fact for the jury, and that their finding upon it ought not to have been disturbed.   The rule at common law did not require that the owner of a building was bound to anticipate its possible destruction by fire, where, from the use to which it was put, or its location, it was not peculiarly exposed to danger from that source, in consequence of which the usual and ordinary modes of ingress and egress furnished by doors,

stairs, halls, and windows might reasonably be deemed sufficient, and if the building was properly constructed the owner was not bound to take extraordinary precaution to prevent a possible injury by burning. Pauley v. Lantern Co., 131 N. Y. 90, 29 N. E. 999; Jones v. Granite Mills, 126 Mass. 84. This rule is not contended against, but the claim is advanced that, by constructing the fire escapes and means of access, defendant lulled the deceased into fancied security, and made his position dangerous by fastening down the windows so they could not be raised, and thus obstructed the means of escape. We think this view cannot be upheld by anything which appears in the case. Is it true that there was any obstruction to the fire escapes? Assuming that the windows above the fourth floor were screwed down, we are unable to see that it constituted such an obstruction as violated any obligation which defendant owed deceased. The windows themselves were frail of structure, and must have been easily broken out by a blow, and undoubtedly quicker than they could be raised and propped up. The evidence abundantly establishes this. Mroz states that he broke out the windows with his shoes, and jumped. Hall ran down from the fifth to the fourth floor; started to go further down, when he saw smoke coming up; came back, kicked out a window, and went down the escape. Adamski reached the fifth floor, when he was forced back by the smoke, knocked out a window, found location of fire escape, went to window opposite, knocked it out, and went safely down. He was followed out of the same window by Ignazak. It does not appear that any of these men were delayed at the windows, or that they had any difficulty in effecting an exit. It is quite plain to be seen that the windows could not withstand a sharp blow or kick, and it is equally clear that either could be delivered as quickly as the windows could be raised. Indeed, Radki, who reached the third floor, said that he kicked out the window, and went down the escape; that he did not try to lift it up, for want of time. Hall states that he did not try to open the window, but kicked it out. This testimony, and the character of the structure, sufficiently indicate that the fastening of the window furnished no more obstruction to reaching the escape than if it had not been fastened; for the emergency of the situation drove these men to the more speedy method of breaking out, instead of attempting to raise it. For the latter, as was said, there was no time. No one who reached the escape was turned back, or prevented exit, on account of the fastening. It is said that the men were forbidden to break the windows, and consequently were deterred from doing it, or that an inference can be drawn that such was the case. There is no evidence of such fact, and it would be stultification of mediocrity to say that a notice evidently referring to the conduct of the business in the usual way interposed to constrain men to be burned up rather than break out a window. It could convey no such meaning when the building was burning, and no inference can arise that it could, to any person. Inferences that may be drawn are such as are reasonable. So far as the fourth floor is concerned, there is no evidence that the window through which Lewandowski passed was fastened down, nor is there any evidence that if

it was the men were delayed a single moment in effecting an opening. Those who broke it out were sworn, but they do not say whether the window was fastened or not, nor do they speak of any delay on account of it, nor is there a particle of evidence that deceased tried to reach the window. Lewandowski was three feet away when he threw himself on his face. He reached the window, and went out. After him came Jozwiack, who reached the window later. Deceased was not there, nor is it shown that he attempted to reach it, although he stood near Lewandowski. Proof stops here, and conjecture begins. We may say that he was overcome by the smoke and acid fumes, or that he turned away, and fell down the stairs, or that he was confused, and went another way. But of proof there is none that he was prevented from reaching the window on account of delay in opening it, created by a fastening of which no proof exists, and of delay of which no one speaks. Conjectures of this character were condemned in the Pauley Case. As is expressed in one opinion, there is "food for speculation," but "the law demands proof." Bond v. Smith, 113 N. Y. 378, 21 N. E. 128. What we do know is that Huda did not reach the window. Another did after Huda's companion had. This is all we know. The route by the bridge was open, the way to the roof unobstructed, and the windows at the escapes easily passed. We think this condition complied with the common-law obligation resting upon defendant, within the authorities cited, and that negligence cannot be predicated thereon.

If we say that the fastening was an obstruction, plaintiff is not assisted. Deceased had been at work in the factory for over 12 years. He was therefore familiar with the methods used, and his surroundings. All of the witnesses who were called by plaintiff were men engaged in the same general employment, and they each testify that the windows were fastened down, to their knowledge. Huda, from his length of service, the general knowledge of the men, the necessities of the business, and the process of manufacture, must be presumed to have known, or possessed the means of knowing, what was the common knowledge of all. The condition being known, the risk of the situation was assumed. Crown v. Orr, 140 N. Y. 452, 35 N. E. 648, where it is said, "If he voluntarily entered into or continues in the service, without objection or complaint, having knowledge or the means of knowing the dangers involved, he is deemed to assume the risk, and to waive any claim for damages against the master in case of personal injury to him." There is no exception to this rule, but there are distinctions of fact not always entirely clear. The risks which the servant does not assume are pointed out in McGovern v. Railroad Co., 123 N. Y. 280, 25 N. E. 373, and still further applied in Davidson v. Cornell, 132 N. Y. 228, 30 N. E. 573, and many other cases. It is not profitable to enter into an extended discussion of them. It is sufficient now to say that, however much particular facts may obscure the distinction, and render the rule difficult of application, no case is found holding that liability attaches to the master where the work carried on produces the condition, and such condition is known, or the means of knowing it are furnished the servant. As applied here, the process of manufacture required a high and uniform temper-

ature in the room. This was produced by keeping the windows closed. They were fastened down, and the notices posted. Other and better methods might have been devised, but defendant was not bound to adopt them. It had the right to use this. Sweeney v. Envelope Co., 101 N. Y. 520, 5 N. E. 358. This condition was known, or the means of knowing it were furnished Huda, and when he accepted and continued in defendant's employ, with such knowledge, he accepted the risk, as incident to the employment; and we find no case holding a different rule, applied to similar facts. Cullen v. Norton, 126 N. Y. 1, 26 N. E. 905. We think the reasoning in the Pauley Case is decisive of all the principal questions involved in this appeal relating to the obligations of the defendant respecting the construction of the building, and the avenues of escape therefrom. So far as the claimed defects in other portions of the building—as the absence of the railing from the stairs, the removal of one flight, and the substitution of a ladder, and the holes in the floor—are concerned, it is answer sufficient now to say that it does not appear that these defects, if defects they were, were even remotely connected with anything which Huda did, or with his loss of life. It is a matter of speculation, which, we have seen, is condemned. Nothing appears in Johnson v. Lantern Co., 146 N. Y. 152, 40 N. E. 773, which lends color to the claim. This case expressly reiterates the doctrine of the Pauley Case, and the discussion of the facts clearly shows evidence removed from speculation and guess. They are certainly distinguishable from the present case, for here it is not known that Huda was heard or seen, alive or dead, after Lewandowski left him.

Other questions are presented by the record, but we refrain from further discussion, as they are not likely to again arise, if the view now taken be finally upheld. This length of discussion seemed to be required, in view of the importance of the case, and the pending of other actions. We are led to the conclusion that the order setting aside the verdict was right, and should be affirmed.